**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
The Honorable Michael E. Romero**

| | |
|---|---|
| In re: | Case No. 23-13341 MER |
| Chase Goll, | Chapter 7 |
| Debtor. | |
| Stephen R. Laake, Jars Bars LLC, | Adversary Pr. No. 24-1031 MER |
| Plaintiffs, | |
| v. | |
| Chase Goll, | |
| Defendant. | |

**ORDER**

THIS MATTER comes before the Court following a trial on the Complaint filed by Plaintiffs, Stephen Laake ("**Laake**") and Jars Bars LLC ("**Jars Bars**") (collectively "**Plaintiffs**"), alleging certain debts the Debtor, Chase Goll ("**Goll**"), owes them should be deemed nondischargeable under 11 U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6).[1]  The Plaintiffs argue that Goll fraudulently induced them to forbear collecting on a loan and stole their collateral.

**BACKGROUND**

This dispute centers on a now-closed tavern that operated in Idaho Springs, Colorado.  Laake formerly owned and operated the tavern through his company, Plaintiff Jars Bars LLC.  In 2019, Laake decided to sell the business to Goll, who was then working as a bartender at the tavern.  Goll formed Yeti Saloon LLC ("**Yeti**") to complete the transaction.  On January 6, 2020, Jars Bars and Yeti signed a Purchase of Business Agreement ("**Purchase Agreement**"), pursuant to which Jars Bars agreed to sell the tavern business to Yeti for a purchase price of $210,349.[2]  Because the tavern operated in a leased space owned by an unrelated third party, the purchase included only the business and its assets.  The Purchase Agreement provides that "[t]he Purchase Price will be paid by the Purchaser [Yeti] with a promissory note (the

---

[1] All references to "section" or "§" shall refer to Title 11, United States Code, unless expressly stated otherwise.

[2] Ex. 3.

'Promissory Note') in the form attached, in the amount of the Purchase Price, made out to the Seller [Jars Bars]."[3] There is no form of promissory note attached to the Purchase Agreement. Although the Purchase Agreement is signed and notarized, the parties dispute whether a promissory note was ever signed. Plaintiffs point to a "**Loan Agreement**" between Laake and Goll, but that document is unsigned, and Goll denies signing it.[4] Plaintiffs nevertheless argue that the Loan Agreement binds Goll and that the loan debt is secured by a lien on the business, even though the parties did not sign a separate security agreement or file a UCC-1 to perfect the alleged lien.

Things did not go well for the newly purchased tavern business. Shortly after the parties signed the Purchase Agreement, the COVID pandemic shut down all bars and restaurants. Laake attempted to help Goll's struggling business by paying some expenses out of his own pocket. Laake also gave Goll some leeway in making loan payments. The parties agree that Goll made 12 sporadic loan payments totaling $61,000 between March 2020 and July or August 2021, after which all payments stopped.[5] When Laake contacted Goll about the missing payments, Goll initially responded that he intended to make the payments but needed more time. In December 2021, Laake sent Goll a text message requesting payment. Goll responded with a text saying that the tavern was not making money, but that he would receive a large sum in six months, which would allow him to pay all debts.[6]

About two weeks after this text exchange, Laake sent a letter to Goll demanding payment in full or a payment plan.[7] Three months later, after receiving no further payments, Laake's attorney sent another demand letter requiring payment in full by April 31, 2022.[8] Again, Goll made no payments, and on September 8, 2023, Plaintiffs initiated a state court action in the Clear Creek County District Court (the "**Civil Action**") against Goll and Yeti.[9] Goll eventually closed the tavern around June 2023.

During the Civil Action, Goll filed a motion for summary judgment in which he falsely asserted he had repaid the loan debt to Plaintiffs in full. He supported his assertions with copies of checks and bank statements he had forged or falsified to show payments that he never made.[10] Goll filed for bankruptcy before the state court entered a final judgment in the Civil Action. Postpetition, the Colorado District Attorney's Office

---

[3] *Id*., ¶ 8

[4] Ex. 4.

[5] ECF No. 44, Joint Pre-Trial Statement, Stipulated Facts, ¶ 9; Ex. 8.

[6] ECF No. 44, Joint Pre-Trial Statement, Stipulated Facts, ¶ 12 (emphasis added).

[7] Ex. 8.

[8] Ex. 9.

[9] Ex. 14, Case No. 2022CV30019.

[10] ECF No. 44, Joint Pre-Trial Statement, Stipulated Facts, ¶¶ 19-23.

2

filed a criminal action (the "**Criminal Action**") against Goll, alleging, among other things, that he falsified bank statements and checks during the Civil Action. Goll eventually entered into a plea deal in which he pled guilty to one count of unauthorized use of a financial transaction device. The state court in the Criminal Action entered an "Order Re Restitution" on February 5, 2024 (the "**Restitution Award**") in favor of Laake in the amount of $56,444.50 for attorney fees incurred in the Civil Action.[11]

Plaintiffs then initiated this adversary proceeding against the Goll, alleging claims for nondischargeability of debt under § 523(a)(2)(A), (a)(4), and (a)(6). Plaintiffs do not seek to declare the Restitution Award as nondischargeable. Rather, Plaintiffs focus on two other alleged debts: (1) the outstanding amount due under the disputed Loan Agreement and/or the value of the tavern business; and (2) the amount of money Goll allegedly stole or embezzled from Yeti's bank account and used for his own personal benefit, plus trebled damages and attorney fees.

## ANALYSIS

### A. Existence of a Debt

A nondischargeability claim involves a two-part analysis. The first component is to determine the validity of the debt under applicable law.[12] If there is a valid debt, the second component is to determine the dischargeability of that debt under § 523.[13] There may be substantial overlap between these two components, especially regarding allegations of fraud and misrepresentation.[14] Laake bears the burden of establishing nondischargeability of a particular debt under § 523(a) by a preponderance of the evidence.[15]

Plaintiffs assert Goll owes them two nondischargeable debts, but their calculation and description of these two debts have been inconsistent and somewhat confusing. The first debt Plaintiffs list as either **$230,655.14** or **$210,349.28**, described in various ways as the outstanding amount due under the alleged Loan Agreement signed by Goll, the purchase price of the tavern, and/or the value of the tavern business. The second debt is listed as either **$76,766.18** or **$79,766.18**, representing the amount Goll allegedly stole from Yeti's bank account, plus trebled damages, for a total of either $307,064.72 or $319,064.72, plus attorney's fees.

---

[11] *Id.*, ¶¶ 41-44.

[12] *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 8 (10th Cir. BAP 2016); *McNulty v. Palecki (In re Palecki)*, 667 B.R. 581, 610 (2025).

[13] *In re Thompson*, 555 B.R. at 8.

[14] *In re Palecki*, 667 B.R. at 610.

[15] *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).

3

1.     ***$230,655.14 or $210,349.28***

In various pleadings, including the parties' joint pretrial statement and their initial closing brief, Plaintiffs ask for entry of judgment for $230,655.54, which they describe as the principal amount Goll owes under the Purchase and Loan Agreements with interest accrued at the 7.5% per annum rate listed in the Loan Agreement.[16] In their closing reply brief, Plaintiffs alter the amount and description of this debt. They lower the amount to $210,349.54 plus 8% interest and describe the debt as either the purchase price for the tavern or the value of the tavern business, plus interest at the Colorado statutory rate.[17] Plaintiffs do not explain the reasons for these changes nor specify which calculation is correct. The Court will therefore address both amounts.

a.     Unpaid Purchase Price/Loan Amount ($230,655.54)

In the pleadings where Plaintiffs argue that Goll owes them the unpaid loan amount ($230,655.54), they rely on two documents to establish the debt—the Purchase Agreement and the unsigned Loan Agreement. The Purchase Agreement is between Jars Bars, LLC as "Seller" and Yeti as the "Purchaser."[18] It states that Yeti will purchase the tavern and requires Yeti to pay the purchase price of $210,349 for the tavern through a "Promissory Note."[19] Goll admits he signed the Purchase Agreement on behalf of Yeti. As discussed above, however, there was no "Promissory Note" attached to the Purchase Agreement, and Goll denies ever signing one.

Laake contends he and Goll did sign the second document, the Loan Agreement, at the same time as the Purchase Agreement.[20] Although Laake testified the unsigned version is identical to the one signed by him and Goll, the Court questions the document's reliability. It appears, at best, to be a draft because neither party has signed it, it lists a different loan amount ($220,000) than the purchase price in the Purchase Agreement ($210,349), and it requires payments to start one day before the Purchase Agreement date. The loan term is also unclear, as the Loan Agreement states payments will start and end on the same date (January 5, 2020), whereas the Purchase Agreement anticipates the loan will be fully repaid by January 31, 2025. The obligors listed in the two Agreements also differ. The Purchase Agreement requires Yeti to pay the purchase price for the tavern, whereas the Loan Agreement lists Goll as the party liable for the purchase price debt.

Laake did not explain these inconsistencies, other than that he drafted them without the assistance of counsel, based on forms he downloaded from the internet.

---

[16] ECF No. 44, at 10; ECF No 53, at 24. The exact method by which Plaintiffs arrived at the $230,655.14 figure is unclear.

[17] ECF No. 55, at 4.

[18] Ex. 3.

[19] *Id.*, ¶ 8.

[20] Ex. 4.

4

The difference in obligors is important because, as a general rule, the owner or shareholder of a corporate entity cannot be held liable for the entity's debts.[21] In other words, if only Yeti agreed to pay the purchase price, Goll cannot be held personally liable for that debt absent a separate guaranty or application of an equitable doctrine like piercing of the corporate veil, neither of which Plaintiffs have alleged or proven.

The parties stipulated the following fact: "Goll, using his LLC, agreed to pay JARS the purchase price of $210,349.28 for the Tavern."[22] At trial, Goll was asked repeatedly about whether he owed a debt to Plaintiffs. In response, he sometimes specified that Yeti agreed to pay the purchase price and emphasized that the debt was created by the Purchase Agreement, which Yeti signed. This testimony was not entirely believable, given that in other responses, he freely admitted personal liability for the purchase price. For example, Plaintiffs' counsel asked, "You took on the debt of the... $210,000 to Mr. Laake, correct? Goll's response was "Correct." Goll also testified that, although he never signed a loan agreement, he and Mr. Laake had a "verbal agreement" to pay the purchase price. Goll also admits that he, not Yeti, made 12 loan payments to Laake.[23] Considering the totality of the evidence, the Court finds Plaintiffs have established that Laake and Goll had a verbal agreement that Goll would personally pay Laake $210,349 for the purchase of the tavern. Plaintiffs have failed to establish, however, that the terms of that verbal agreement were identical to or controlled by the unsigned Loan Agreement.

Accordingly, the Court finds Goll owes Laake the purchase price of the tavern, $210,349, less any payments made towards that debt. The parties agree that Goll made payments totaling $61,000 to Laake, reducing the debt to $149,349.28. Plaintiffs' calculation of the debt at the higher amount of $230,655.54 appears to include interest accrued under the Loan Agreement, which provides for 7.5% interest. As discussed above, however, the Loan Agreement is not controlling. Plaintiffs failed to present any other evidence that Goll agreed to pay interest on the outstanding debt. Thus, the Court declines to include interest.

      b.    Value of Assets/Business ($210,349)

In their closing reply brief, Plaintiffs change course. They abandon reliance on the Loan Agreement to establish the debt at $230,655.54. Instead, Plaintiffs argue Goll stole or embezzled Plaintiffs' collateral, consisting of all the tavern's assets, which Plaintiffs value at $210,349.[24] Under Colorado law, a secured party may bring a claim

---

[21] *Together Real Estate Holdings, LLC v. Roberts (In re Roberts)*, 2023 WL 2565721, at *24-25 (Bankr. D. Colo. March 17, 2023) ("In Colorado, it is hornbook law that corporate officers and shareholders cannot be held liable for the debts of the corporation based on that status alone.").

[22] ECF No. 44, Joint Pre-Trial Statement, Stipulated Fact, ¶ 8.

[23] ECF No. 44, Joint Pre-Trial Statement, Stipulated Fact, ¶ 9

[24] Plaintiffs also contend they retained title/ownership of the tavern's assets, which Goll stole thereby creating a debt in the amount of the assets' value ($210,349). This argument is based on language in the Loan Agreement stating that Plaintiffs would "retain title" to assets until Goll made payment in full. ECF

for conversion or civil theft against a party who wrongfully obtained and sold property in which the secured party has a security interest."[25] While civil theft and conversion are distinct claims, both would require proof that the secured party had rights in the collateral at issue.[26] Whether Plaintiffs had rights to the tavern's assets depends on whether they had a valid security interest in any of those assets. Article 9 of Colorado's Uniform Commercial Code ("**UCC**") controls the attachment and enforceability of security agreements.[27] To create a security agreement that is enforceable against Goll or Yeti, the following conditions must be met: (1) value has been given; (2) the debtor [Goll or Yeti] has rights in the collateral or the power to transfer rights in the collateral to a secured party and (3) either the debtor has signed a security agreement that describes the collateral or, in the case of deposit account, the secured party has sufficient control over the deposit account.[28]

      The third element is problematic for Plaintiffs. There is no separate signed security agreement between the parties. The disputed Loan Agreement contains a section entitled "Security" and describes the collateral as "Business located at 1631-33 Miners St, Idaho Springs, CO 80452."[29] However, for the reasons discussed above, the Loan Agreement is unsigned and unreliable and cannot serve as an enforceable security agreement. Plaintiffs also rely on the Purchase Agreement, which Goll signed on behalf of Yeti. That Agreement does not contain the words "security interest" or "security agreement." The Plaintiffs point to paragraph 16(h), which states "The sale of [the] business is based on [a] loan provided by Stepehen Laake DBA JARS Bars LLC. If 3 payments are missed or [the] loan is not fully repayed [sic] by Jan 31, 2025 the business and all assets will return to JARS Bars LLC/Stephen Laake."[30] Plaintiffs do not cite any authority holding that this type of default provision is sufficient to create a security agreement. Even if you could construe it as such, to be an *enforceable* security interest, it must also contain a sufficient description of the collateral affected. Article 9 says that a sufficient description of collateral is one that "reasonably identifies what is

---

No. 53, at 20; Ex. 4, ¶ 8. As stated above, the Loan Agreement is not controlling. Even if it was, such retention-of-title language merely creates a possible security agreement and would not result in retention of ownership rights. *Young v. Golden State Bank*, 560 P.2d 855, 858 (Colo. App. 1977); *see also* 3A *Anderson U.C.C.* § 2-401:120 (3d. ed. Dec. 2025 Update) ("Even when the parties intend that the seller retain the title to the goods, the reservation of title only has the effect of a security interest. The fact that the parties intended that title be reserved has no effect.").

[25] *Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186, 1195 (2008); *Former TCHR, LLC v. First Hand Mgmt. LLC*, 317 P.3d 1226, 1234 (Colo. App. 2012).

[26] *Rhino Fund, LLLP v. Hutchins*, 215 P.3d at 1195; *see also Itin v. Ungar*, 17 P.3d 129 (2000) (distinguishing conversion from the crime of theft because conversion does not require that a wrongdoer act with the specific intent to permanently deprive the owner of his property.).

[27] Colo. Rev. Stat. § 4-9-203.

[28] *Id*. § 4-9-203(b)(1), (b)(2), (b)(3)(A), (b)(3)(D).

[29] Ex. 4, ¶ 7.

[30] Ex. 3, at 8.

6

described."[31] "A description of collateral such as 'all the debtor's assets' or 'all the debtor's personal property' or using words of similar import does not reasonably identify the collateral."[32] The UCC gives several examples of sufficient collateral descriptions, including: a specific listing, a category, a quantity, a computational formula, a "type of collateral" that is defined in Article 9 (e.g., inventory, fixtures, equipment), or any other method, if the identity of the collateral is "objectively determinable."[33]

There is no description of collateral in the above-cited paragraph. The term "business and all assets" is hardly descriptive and is very similar to the overly generic description of "all the debtor's assets" prohibited by the UCC. A different paragraph of the Purchase Agreement defines the "Assets" sold to consist of (i) all inventory and packaging; and (ii) Business in its entirety except the name JARS Bars LLC; and do not include any Excluded Assets."[34] At best, the language created a security interest in Yeti's "inventory and packaging"—the only collateral specifically mentioned in the Purchase Agreement.[35] Although the Court received no evidence on this topic, the tavern's inventory presumably consisted of food and beverages. The Court received no evidence indicating Goll took food or beverages from the tavern at any time. Nor did the Court receive evidence concerning Plaintiffs' attempts to recover inventory or the inventory's value at that time.[36] Without such evidence, Plaintiffs have failed to establish Goll owed them a debt for stolen inventory.

### 2. *$76,766.18 or $79,766.18*

The other debt alleged by Plaintiffs is also based on allegations of stolen collateral. Specifically, Plaintiffs contend Goll caused Yeti to make multiple transfers of money from the tavern's bank account to Goll's personal account and that this money was Plaintiffs' collateral. Plaintiffs initially listed the total of these transfers at $76,766.18, but they later amended the amount to $79,766.18. Although Plaintiffs do not explain the change in numbers, the difference in amounts appears to be due to a typographic error, and that $79,766.18 is the correct figure.[37]

---

[31] Colo. Rev. Stat. § 4-9-108(a).

[32] *Id*. § 4-9-108(c).

[33] *Id*. § 4-9-108(b).

[34] *Id*., ¶ 1(a). The term "Excluded Assets" is defined as "Name and rights to name (JARS Bars LLC). *Id*., ¶ 1(c).

[35] *See Young v. Golden State Bank*, 560 P.2d 855, 858-89 (Colo. App. 1977).

[36] The Purchase Agreement lists the purchase price of the inventory at $9,534.11 as of January 6, 2020. This value no doubt fluctuated as the tavern purchased and sold inventory to customers.

[37] *See* Ex. 13 (listing transfers totaling $69,766.18) and Ex. 21 (additional check for $10,000 to Victory Motors). The Court notes the check to Victory Motors is dated December 4, 2020, a month prior to the date Goll signed the Purchase Agreement.

Whether Plaintiffs had rights to the monies deposited in Yeti's bank account depends on whether they can prove they had a valid security interest in those funds. On that count, Plaintiffs run into the same problem discussed above—lack of a signed security agreement between the parties. The parties signed the Purchase Agreement, but its description of assets is vague. For security interests in deposit accounts, in particular, a creditor cannot rely on mere type descriptions.[38] In other words, merely describing collateral as "all deposit accounts" without further detail about the specific account would be insufficient to create a security interest. The Purchase Agreement makes no mention of deposit accounts. As such, the Court concludes the Purchase Agreement did not create a security interest in Yeti's bank account.[39]

In their closing reply brief, Plaintiffs assert for the first time that the funds deposited in Yeti's bank account were "proceeds" from the sale of inventory to which their security interest attached.[40] Under the UCC, the attachment of a security interest in collateral gives the secured party certain rights to the proceeds of that collateral.[41] Specifically, Colo. Rev. Stat. § 4-9-315 provides that "[a] security interest attaches to any *identifiable* proceeds of collateral."[42] "Proceeds" is defined to include anything acquired (including cash) upon the sale, lease, license, exchange, or other disposition of the collateral.[43] Where, as in this case, the alleged proceeds are in the form of cash, the statute provides that such proceeds are "identifiable" when "the secured party identifies the proceeds by a method of tracing, including application of equitable principles, that is permitted under law other than this article with respect to commingled property of the type involved."[44] The official comments suggest that one acceptable method of tracing cash proceeds in a commingled account is the "lowest intermediate balance rule."[45]

---

[38] *Id*. § 4-9-108(e)(3).

[39] The other method of creating a security interest in a deposit account is for the creditor to obtain sufficient control over the deposit account. The UCC describes several methods for a creditor to obtain control of a deposit account, including having a signed agreement with the bank that the bank will comply with the creditor's instructions, or the secured party becomes the bank's customer with respect to the deposit account. Colo. Rev. Stat. § 4-9-105(a)(2), (3). Plaintiffs have offered no evidence that they had such control over Yeti's account.

[40] ECF No. 55, at 4.

[41] Colo. Rev. Stat. § 4-9-203(f).

[42] Colo. Rev. Stat. § 4-9-315(a)(2) (emphasis added).

[43] Colo. Rev. Stat. § 4-9-102(64), (9).

[44] Colo. Rev. Stat. § 4-9-315(b)(2).

[45] *Id*., cmt. 3

In this case, Goll admits he deposited revenues from the tavern in Yeti's bank account.[46] Presumably, these revenues resulted from the sale of the tavern's inventory (food and beverages) and could be considered proceeds of the inventory. The bank statements for Yeti's account were not admitted at trial, so the Court lacks specific details about deposits.[47] However, Goll generally testified that there were transfers of funds going "both ways" between his personal bank account and Yeti's account. He further testified that he took out a $75,000 SBA loan and cash advances on credit cards and used those funds to pay the tavern's expenses after COVID closed the bar. This testimony suggests that the tavern's revenues were commingled with other funds. Plaintiffs did not attempt to trace or otherwise identify revenues deposited in the Yeti bank account. Without such evidence, Plaintiffs have failed to prove their security interest attached to proceeds in Yeti's bank account in accordance with Colo. Rev. Stat. § 4-9-315.

Without a valid security interest in Yeti's bank account or the funds deposited therein, there can be no conversion or theft of collateral deposited in that account. Accordingly, the Court concludes Plaintiffs failed to establish Goll owes them a debt for $79,766 or related trebled damages and attorney's fees.

In summary, Plaintiffs have established Goll owed them one debt for **$149,349.28** for the unpaid portion of the loan. Plaintiffs have not established that Goll owes them a debt for theft of collateral, whether it be the entire tavern business, all the tavern's assets, or funds from Yeti's bank account.

### B.    § 523(a)(6)

Plaintiffs' § 523(a)(6) claim focuses on allegations that Goll committed civil theft of $79,766 of Plaintiffs' collateral and that such theft amounts to willful and malicious conduct.[48] As discussed above, Plaintiffs have failed to prove a security interest in the funds deposited in Yeti's bank account. Thus, Goll's use of those funds cannot amount to theft of Plaintiffs' collateral. Plaintiffs' claim under § 523(a)(6) therefore fails, as does their request for treble damages and attorney's fees under Colorado's civil theft statute.

### C.    § 523(a)(4)

For their claim under § 523(a)(4), Plaintiffs allege that Goll "embezzled" $79,766 of Plaintiffs' collateral from Yeti's bank account and "embezzled" the other assets of the tavern valued at $210,349.[49] Section 523(a)(4) provides that a debtor may not discharge a debt "for fraud or defalcation while acting in a fiduciary capacity,

---

[46] ECF No. 44, Joint Pre-Trial Statement, at 5, ¶ 15.

[47] Plaintiffs' Witness and Exhibit List describes exhibit 11 as Yeti's bank statements but exhibit 11 was not offered or admitted at trial. *See* ECF No. 46, Minutes of Proceeding.

[48] ECF No. 53, Plaintiffs' Closing, at 21-22, 24.

[49] In their closing brief, Plaintiffs allege Goll's embezzlement resulted in "over $350,000 in damages" but wholly fail to explain the derivation of this figure. ECF No. 53, at 21. Thus, the Court will not address it.

embezzlement, or larceny."[50]  Embezzlement under § 523(a)(4) is defined as the "'fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come, and it requires fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud.'"[51]  An embezzlement claim has five elements: "1. Entrustment (property lawfully obtained originally); 2. Of property; 3. Of another; 4. That is misappropriated (used or consumed for a purpose other than that for which it was entrusted); 5. With fraudulent intent."[52]  Plaintiffs have the burden to establish each element by a preponderance of the evidence.[53]

As discussed above, the Plaintiffs have failed to establish that Goll stole or misappropriated collateral consisting of cash proceeds or all the tavern's assets.  Instead, Plaintiffs' security interest was limited to inventory and packaging.  Plaintiffs presented no evidence that Goll absconded with the tavern's inventory or packaging.  Even if Plaintiffs could prove theft of their collateral, their embezzlement claim would still fail.  The main hurdle is element three—the property embezzled must be property owned by someone else.  It is widely recognized that one cannot steal or embezzle one's own property.[54]  A creditor holding a security interest in collateral does not have absolute ownership of that collateral.  Rather, the collateral is owned by the debtor subject to the creditor's security interest.[55]  Thus, a debtor who misappropriates a creditor's collateral does not embezzle that property.[56]  As one court put it:

> a debtor that misappropriates a creditor's collateral, and uses it for purposes other than repaying the creditor's loan, does not steal or embezzle that property. The actions may be a breach of contract, or even conversion, but not embezzlement or larceny under § 523(a)(4).[57]

Thus, the Plaintiffs' § 523(a)(4) claim fails.

---

[50] 11 U.S.C. § 523(a)(4).

[51] *Driggs v. Black (In re Black),* 787 F.2d 503, 507 (10th Cir.1986); *Kim v. Sun (In re Sun)*, 535 B.R. 358, 367 (10th Cir. B.A.P. 2015).

[52] *Bryant v. Tilley (In re Tilley)*, 286 B.R. 782, 789 (Bankr. D. Colo. 2002).

[53] *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

[54] *Oak St. Funding LLC v. Brown (In re Brown)*, 399 B.R. 44, 47 (Bankr. N.D. Ind. 2008).

[55] *First Nat. Bank of Fayetteville, Ark. v. Phillips (In re Sisemore),* 882 F.2d 302, 304-05 (8th Cir.1989); *Assoc. Bank, N.A. v. Sever (In re Sever)*, 438 B.R. 612, 631 (Bankr. C.D. Ill. 2010); *Thompson v. Barbee (In re Barbee)*, 479 B.R. 193, 208 (Bankr. S.D. Ga. 2012).

[56] *In re Sever*, 438 B.R. at 631 (citing cases); *In re Barbee*, 479 B.R. at 208; *In re Jacobs*, No. 09-61145, 2011 WL 1299690, at *9 (Bankr. E.D. Tex. Apr. 1, 2011); *In re Brown*, 399 B.R. at 47-48.

[57] *In re Brown*, 399 B.R. at 47-48.

## D. § 523(a)(2)(A)

The Plaintiffs final claim is under § 523(a)(2)(A), which provides that a Chapter 7 discharge does not discharge a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."[58] Plaintiffs assert Goll committed two types of fraud under this subsection—false representations and actual fraud.

### 1. False Representations

To establish a false misrepresentation claim under § 523(a)(2)(A), Plaintiffs must meet the following elements: (1) debtor made a false representation; (2) debtor made the representation with the intent to deceive the creditor, (3) the creditor relied on the representation, (4) the creditor's reliance was justifiable; and (5) debtor's representation caused the creditor to sustain a loss.[59] Plaintiffs contend Goll made certain misrepresentations to Laake about his ability to repay the loan debt. Laake contends he relied to his detriment on these representations by forbearing from collection of the loan debt. Plaintiffs assert these representations resulted in damages in the amount of either $230,655 (amount due on the loan) or $210,349 (purchase price of the tavern).[60]

Notably, all Goll's alleged misrepresentations occurred months *after* Goll agreed to purchase the tavern and originally incurred the loan debt in January 2020. In other words, Plaintiffs do not contend Goll's misrepresentations fraudulently induced them to enter into the loan agreement in the first instance. Rather, Goll's alleged false representations occurred after he stopped making loan payments in mid-2021. Laake testified he did nothing about Goll's default for about three months. Then, in late 2021, Laake began asking Goll for a payment. In response, Goll told Laake on several occasions that he would receive a large sum of money and would use those funds to pay the loan. On December 18, 2021, Laake sent Goll a text message asking for a loan payment. On or about December 21, 2021, Goll responded with the following text message:

> If your [sic] this upset and want the bar back that doesn't make any money you're more than welcome to give me my money back and you can have the bar back that you told me made money that doesn't that's completely fine with me. Or I can sell to someone else and take care of everything and quit loosing [sic] money. Or in six months I can pay off all the bars [sic] debts and take care of everything. It doesn't matter to me the place doesn't make any money anyways but I do care about the people that work there though cause I'm not a jerk. But nothing happens overnight like you seem to think and I can't write checks for that place if it has no money to cover the check.

---

[58] 11 U.S.C. § 523(a)(2)(A).

[59] *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 789, 791 (10th Cir. 2009).

[60] ECF No. 53, at 24, ECF No. 55, at 14.

11

> Which is why the last time we talked I told you what was up and we came to an agreement on the situation. I'm willing to work with and do what I can when I can until I get this very large sum of money to take care of everything in about six months but I will not be harassed or bullied by you or anyone else for that matter. So it's up to you on how you want to handle the situation? I prefer to handle it like adults who can get along and are understanding of each other not like children.[61]

Two weeks after this text exchange, on January 6, 2022, Plaintiffs hired an attorney and sent a demand letter to Goll, followed by a second demand letter in April 2022.[62] Plaintiffs filed their state court action against Goll on September 8, 2022.

Plaintiffs argue Goll's text message contains two misrepresentations: (i) Goll misrepresented that the tavern was unprofitable; and (ii) Goll misrepresented that he would soon obtain a large sum of money he would use to pay the loan. Plaintiffs contend the first statement about the tavern's probability was false because, at the time, Goll was transferring monies out of Yeti's bank account into his own personal bank account. Even assuming this is the case, however, the existence of transfers does not establish that the tavern's business was, in fact, profitable. Both Laake and Goll testified to the struggles the tavern faced due to the pandemic. The Court received no bank records or financial statements for Yeti showing income or expenses. While Goll does not deny transferring $79,766 from Yeti's account into his personal bank account, he explained that transfers were going both ways and that he used personal credit card advances and loans to pay tavern expenses. None of the Plaintiffs' evidence refutes this explanation. Plaintiffs have therefore failed to establish that Goll's statements about the tavern being unprofitable were false.

Goll admits the second representation about coming into a large sum of money in six months turned out not to be accurate. He testified that at the time he wrote the text, he was working to secure a large loan that never came to fruition, implying that the statement was true at the time he made it. A debtor's statement regarding his future intention, such as a promise to act, is fraudulent if he does not have that intention at the time he makes the representation.[63] On the other hand, if a debtor intends to perform at the time he made his promise, but subsequently decides that he cannot or will not so perform, then his initial representation is not actionable fraud.[64] In this case, it is difficult to determine whether Goll actually believed he would obtain additional funds, as the Court was provided no other details about the alleged loan. Even assuming Goll did not believe he would obtain additional funds at the time he sent the text message, Plaintiffs have failed to establish the other necessary elements of their § 523(a)(2)(A) claim.

---

[61] Ex. 7.

[62] Exs. 8, 9.

[63] *Weaver & Assoc. v. Devall (In re Devall)*, 2012 WL 1158697, at *3 (Bankr. D. Colo. April 6, 2012).

[64] *Id*.

Courts, including the Tenth Circuit, have recognized that fraudulently inducing a creditor to forbear from collecting on a loan can, in some circumstances, form the basis of a § 523(a)(2)(A) claim.[65] Such claims can be problematic due to the timing of the representations. In many fraudulent misrepresentation cases involving loans, the misrepresentations occur at the inception of the loan or, in other words, the debtor's misrepresentations induce the creditor to make the loan or extend credit.[66] In such situations, there is a clear causal link between the debtor's fraudulent conduct and incurrence of the debt, thereby establishing nondischargeability because the loaned funds were clearly "obtained by" the debtor's false representations, as required by § 523(a)(2)(A).[67]

In the case of loan forbearance, the debtor's fraudulent representations occur *after* the creditor makes the original loan. In that situation, it is more difficult to conclude the loaned funds were "obtained by" fraud because the debtor already has the funds when the misrepresentations are made. Courts have dealt with the situation by focusing on multiple types of debts Congress included in the introductory paragraph of § 523(a)(2): "any debt . . . *for money, property, services, or an extension, renewal, or refinancing of credit*, to the extent obtained by . . . a false representation."[68] These courts conclude that a creditor's agreement to forbear from collecting an existing loan can equate to an "extension" or "renewal" of credit under § 523(a)(2)(A), even if the creditor provides no new funds to the debtor.[69] For example, a creditor giving a debtor additional time to repay a loan that the creditor otherwise could have accelerated may be deemed an extension of credit.[70] In that instance, the original unpaid loan debt may

---

[65] *See John Deere Co. v. Gerlach (In re Gerlach)*, 897 F.2d 1048, 1051 (10th Cir. 1990) (dealing with the extension of new credit); *Ojeda v. Goldberg*, 599 F.3d 712 (7th Cir. 2010); *In re Paddock*, 533 B.R. 798, 805-06 (2015).

[66] See *Valley Memorial Homes v. Hrabik (In re Hrabik)*, 330 B.R. 765, 772-73 (Bankr. D.N.D. 2005) ("To sustain a claim of nondischargeability under section 523(a)(2)(A), [a plaintiff] therefore must make a threshold showing that the alleged fraud existed at the time of, and has been the methodology by which, the money, property or services were obtained . . . . Misrepresentations made subsequent to the creation of the debt have no effect upon the dischargeability of a debt, since the false representation could not have been the creditor's reason for the extension of credit."); *In re Roberts*, 2023 WL 2565721, at *18 (Bankr. D. Colo. March 17, 2023) ("Post-transaction misrepresentations are irrelevant since the creditor could not have relied on such misrepresentations when making the loan.").

[67] *In re Hrabik*, 330 B.R. at 765 ("The language 'obtained by' clearly indicates that the fraudulent conduct occurred at the inception of the debt, i.e., the debtor committed a fraudulent act to induce the creditor to part with its money, property or services[.]").

[68] 11 U.S.C. § 523(a)(2)(A) (emphasis added).

[69] *Ojeda v. Goldberg*, 599 F.3d 712, 718 (7th Cir. 2010); *Wolf v. Campbell (In re Campbell)*, 159 F.3d 963, 966-67 (6th Cir. 1998); *Field v. Mans*, 157 F.3d 35, 43 (1st Cir. 1998); *see also In re Gerlach*, 897 F.2d at 1050 (1990) ("[N]ot only is a new debt procured through fraud excepted from discharge, but old debt which is extended, renewed, or refinanced through fraud is also nondischargeable.

[70] *Field*, 157 F.3d at 43-44 ("As the [creditors] would or could have called the note had they known the truth, [debtor's] fraud tended to perpetuate—hence "extend"—credit that otherwise the [creditors] would or could have stopped."); *In re Campbell*, 159 F.3d at 966 ("The waiver of default and the agreement to

13

be deemed nondischargeable if the creditor sufficiently proves the extension was "obtained by" the debtor's fraud. This can be established by demonstrating that the creditor relinquished collection rights it had based on the debtor's conduct. One court aptly distilled the required showing into the following elements: "In determining whether a forbearance is fraudulently induced, the creditor must prove that "[1] it had valuable collection remedies at the time of the misrepresentation, [2] it did not exercise those remedies based upon the misrepresentation, and [3] that the remedies lost value during the extension period."[71]

In this case, the Court cannot determine whether Plaintiffs had any valuable collection remedies at the time of Golls' text message, let alone ones that lost value. There is no signed promissory note detailing Goll's payment obligations or Plaintiffs' remedies upon default. As discussed above, there was no written security agreement, and the vague language contained in the Purchase Agreement, at best, gave Plaintiffs a security interest in the tavern's inventory and packaging. However, the Court received no evidence of the extent or value of that inventory, either at the time of the text message or later. Plaintiffs reference certain equipment they believe Goll may have taken when the tavern closed in 2023. As stated above, Plaintiffs had no security interest in that equipment, and the Court received very little evidence of what equipment existed in the tavern, let alone its value. Even if Plaintiffs had proven they had some valuable collection remedy, any forbearance garnered by Goll's text message was short-lived because Laake hired an attorney and sent demand letters within weeks of receiving the text message. Thus, the Court concludes Plaintiffs have failed to establish they had any valuable collection remedies at the time of Goll's text message, which they declined to exercise based on Goll's misrepresentations. Plaintiffs have therefore failed to establish that Goll's representations fraudulently induced them to forbear from collecting the loan.

### 2. Actual Fraud

Plaintiffs also base their § 523(a)(2)(A) claim on allegations that Goll committed actual fraud. Actual fraud is not limited to misrepresentations and can include various types of fraudulent conduct, such as "when a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right."[72] The Supreme Court has said actual fraud has no precise definition but is broad enough to include, in some instances, fraudulent transfer schemes.[73] To except a debt based on actual fraud, the creditor

---

forbear by the [creditors] in exchange for [debtor's] modified promise to pay formed a deal sufficient to be called a new "extension of credit." The modified debt was obtained by fraud.").

[71] *Ojeda v. Goldberg*, 599 F.3d 712 (7th Cir. 2010) (citing *In re Kucera*, 373 B.R. 878, 885 (Bankr. C.D.Ill. 2007)); *see also In re Paddock*, 533 B.R. 798, 805-06 (2015) ("[T]o prevail on a § 523(a)(2)(A) claim based on the creditor's forbearance, the creditor must prove, among other things, that at the time of the forbearance, it had valuable collection remedies.").

[72] *Pino v. Jensen (In re Jensen)*, 2019 WL 2403105, at *8 (10th Cir. BAP June 7, 2019) (citing *Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 223 (10th Cir. BAP 2013)).

[73] *Husky Int'l Electronics, Inc. v. Ritz*, 578 U.S. 355, 360-61 (2016).

14

must prove: (1) the debtor committed actual fraud; (2) the debtor obtained money, property, services, or credit by the actual fraud; and (3) the debt arises from the actual fraud.[74]

Plaintiffs contend Goll's actual fraud consisted of the following actions: stealing or fraudulently transferring their cash collateral, engaging in forgery and perjury during the Civil Action, and committing postpetition perjury by failing to list certain items on his bankruptcy schedules. Once again, the debt or monies that Plaintiffs assert Goll obtained through this actual fraud are either $230,655 (the amount due on the loan) or $210,349 (the purchase price of the tavern). There are problems with each of the three types of alleged fraud.

First, the Court has already concluded Plaintiffs failed to prove Goll stole or embezzled their collateral by making transfers from Yeti's bank account to Goll's, and so they cannot serve as a basis for actual fraud. Plaintiffs' closing brief contains a conclusory statement that the same bank transfers amount to "fraudulent transfers" of their collateral.[75] However, Plaintiffs did not attempt to set forth or meet the required elements of a fraudulent transfer claim under the Colorado Uniform Fraudulent Transfer Act or other applicable law. Without such proof, Plaintiffs' assertion that Goll orchestrated fraudulent transfers fails.

The second type of alleged actual fraud is Goll's forgery and perjury during the Civil Action. There is no question that Goll's conviction in the Criminal Action and the Restitution Award establishes that Goll committed fraudulent acts during the Civil Action. While the Court finds this conduct reprehensible, Goll's fraud in the Civil Action does not automatically make the loan debt nondischargeable under § 523(a)(2)(A). To succeed on their claim, Plaintiff must also demonstrate a link between that fraud and the debt in question. Specifically, Plaintiff must show that Goll obtained "money, property, services, or credit" by his fraud during the Civil Case and that the debt in question results from or is traceable to that same fraud.[76] Plaintiffs have made no such showing. Goll was already liable for the loan debt at the time of the Civil Action, and there is no evidence that he received any additional money through his conduct. Plaintiffs did not forbear from collecting the loan or extend additional credit to Goll based on his actions during the Civil Case. Because the loan debt was not obtained by and is not traceable to Goll's fraud in the Civil Action, Plaintiffs' § 523(a)(2)(A) claim on that basis fails.

Plaintiffs' allegations of Goll's actual fraud during his bankruptcy case suffer from similar deficiencies. Plaintiffs contend Goll omitted two items he should have listed on

---

[74] *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 10 (10th Cir. BAP 2016).

[75] ECF No. 53, at 24 (The Debtor made fraudulent transfers of thousands of dollars to himself of the LLC's cash all while falsely inducing Mr. Laake and JARS to forbear from collecting after the Debtor's default.").

[76] *Husky*, 578 U.S. at 365 (explaining that a debt is "obtained by" fraud if it is "traceable to" the debtor's fraudulent conduct); *In re Thompson*, 555 B.R. at 10 (listing elements for actual fraud claim); *Hatfield v. Thompson (In re Thompson)*, 585 B.R. 890, 914-15 (Bankr. W.D. Okla. 2017) ("[T]he phrase 'obtained by . . . actual fraud' requires that the debts result from or be traceable to the fraud.").

his Statement of Financial Affairs ("**SOFA**")—his disposition of a pickup truck he purchased for the tavern business and his disposition of Yeti's business records. The standard SOFA form, however, did not require Goll to list either item. The evidence shows Goll purchased the truck in question on December 4, 2020, and he testified he sold it four months later, or in April 2021.[77] The SOFA requires a debtor to list transfers of property in the two years preceding the petition date. Goll filed for bankruptcy on July 27, 2023, and was therefore only required to list transfers made after July 27, 2021. His sale of the truck was not within the look-back period.

The SOFA has no specific requirement for a debtor to list business records held for a non-debtor entity or a debtor's disposition of such records. In response to the question of whether he was holding property that someone else owns, Goll checked the box for "none."[78] Presumably, this means Goll was not holding Yeti's business records on the petition date. Plaintiffs presented no evidence showing Goll's statement was inaccurate. Indeed, the Court received very little evidence concerning Yeti's business records. Plaintiffs have failed to prove Goll committed fraud by omitting items from his SOFA. Even assuming his schedules were somehow shown to be inaccurate, Plaintiffs do not explain how Goll obtained any "money, property, services, or an extension, renewal, or refinancing of credit" through his bankruptcy filings. Plaintiffs also fail to show how Goll's loan debt is in any way "obtained by" or traceable to Goll's bankruptcy schedules.

For all these reasons, Plaintiffs have failed to establish the necessary elements of a § 523(a)(2)(A) claim based on actual fraud.

## CONCLUSION

For the reasons stated above, Plaintiffs have failed to prove their claims under § 523(a)(2), (a)(4), and (a)(6), and the Court denies Plaintiffs' claims for nondischargeability under those subsections. Judgment shall be entered in favor of Goll on all claims in this adversary proceeding. Plaintiffs' Amended Complaint is hereby DISMISSED.

Dated: January 27, 2026.

BY THE COURT:

Michael E. Romero, Judge
United States Bankruptcy Court

---

[77] Ex. 21.

[78] Ex. 29, at 12, SOFA question 23.